# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HAROLD C. HALL,
            *Plaintiff-Appellant,*

v.

CITY OF LOS ANGELES; LOS
ANGELES POLICE DEPARTMENT;
DARYL F. GATES, individual
capacity; MARK ARNESON; KENNETH
CROCKER,
            *Defendants-Appellees,*
            and

LIONEL ROBERT,
                        *Defendant.*

No. 10-55770

D.C. No.
2:05-CV-01977-
ABC-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
December 9, 2011—Pasadena, California

Filed September 24, 2012

Before: Dorothy W. Nelson, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Nelson;
Dissent by Judge Ikuta

11737

## COUNSEL

John Burton, The Law Offices of John Burton, Pasadena, California, for the plaintiff-appellant.

William J. Genego, Nasatir, Hirsch, Podberesky & Genego, Santa Monica, California, for the plaintiff-appellant.

Lisa Berger, Deputy City Attorney, Office of the City Attorney of Los Angeles, Los Angeles, California, for the defendant-appellees.

## OPINION

NELSON, Senior Circuit Judge:

Harold C. Hall appeals the district court's order granting summary judgment to the City of Los Angeles and individual defendants Mark Arneson and Kenneth Crocker (collectively, "Appellees") in this action brought pursuant to 42 U.S.C. § 1983. We conclude that the district court properly granted summary judgment to Appellees on Hall's fabrication-of-evidence claim, and we affirm on that basis. We reverse, however, the district court's denial of Hall's motion to amend his complaint and remand to the district court with instructions to allow Hall to plead an explicit Fifth Amendment violation. The exceptional circumstances in this case persuade us that a remand is necessary to avoid manifest injustice.

## I.   Background

Some might call Hall an unlucky fellow. In October 1984, shortly after he turned 18, Hall witnessed a drive-by shooting ("the 54th Street shooting"). Ten people suffered gunshot wounds, five of whom died. Hall ended up with a broken nose in the ensuing melee.

The police persuaded Hall, who had no gang affiliation, to testify in the 54th Street murder case. The State needed Hall to identify one of the triggermen, "Ace Capone," an infamous member of the Bloods gang. Hall's cooperation with the police put him in such serious danger that the police protected his home every night for many months. Nevertheless, Hall followed through and testified at the preliminary hearing. Midway through his testimony, an attorney revealed Hall's home address. Hall abruptly left the stand, highly agitated and nervous. He had to be persuaded to finish testifying.

Following the preliminary hearing, the police continued to worry about Hall's safety. Wayne Dufort, a detective on the 54th Street case, wanted to keep Hall safe both for Hall's own sake and to ensure his eyewitness testimony at trial. Dufort urged Hall to move a number of times, to no avail. Dufort always was worried about Hall and thought that "there just didn't seem to be enough protection."

Between the preliminary hearing and Hall's arrest for robbery nine months later, Dufort visited Hall's home regularly, sometimes daily. Dufort and Hall met in person about 200 times during those months. These visits fostered a symbiotic friendship of sorts between the two unlikely companions. In addition to being concerned for Hall's safety, Dufort grew to care for and like Hall during that time. The detective wanted to see Hall find a job, attain success and remain safe from any harm he risked by testifying in the 54th Street murder case. Dufort even recommended Hall for a job and gave him a character reference. For his part, Hall saw Dufort as a friend, and

maybe even as a father figure. Dufort gave Hall money, helped him get a job and treated him with respect.

Meanwhile, someone murdered siblings Nola Duncan and David Rainey in June 1985 ("the Duncan-Rainey murders"). Hall, who lived near the crime scene, gathered with other curious neighbors to try to see what had happened. The close proximity of his home to where the police found Duncan's body appears to be Hall's only connection, if one could call it that, to the crime.

The police had reason to believe that Theadry Art Powell, Jr. committed the murders. Powell had a motive: Duncan sold Powell low-quality or doctored PCP hours before she died. When Powell discovered what Duncan had done, a witness overheard Powell exclaim, "I hate that bitch, go kill her!" before three men left Powell's house. When questioned by police, Powell initially claimed that he had not seen Duncan in three months, but later changed his story twice and admitted he had seen her on the night she died. Powell ultimately implicated two of his associates, Jerry Williams and Lonnie Wardlow, suggesting that maybe one or both of them took part in Duncan's murder. A polygrapher determined that both Powell and Wardlow falsely denied their involvement in Duncan's killing. Despite these leads, the police did not investigate Powell, Williams or Wardlow as suspects in Duncan's murder.

The police arrested Hall for robbery in August 1985, six weeks after the Duncan-Rainey murders. Upon his arrest, Hall reached out to Dufort, seeking protection inside the jail from gang members who sought revenge for Hall's testimony in the 54th Street shooting case. Dufort arranged for Hall to be housed with other informants. While his segregation from the general population may have helped protect Hall from physical attacks, he became a sitting duck for predatory informants. Three experienced jailhouse informants, with cases pending, discussed Duncan's murder with Hall. Those informants then

falsely implicated Hall in the Duncan-Rainey murders by concocting a story that Hall had confessed to the murders.

Detectives Arneson and Crocker, Appellees, worked on the Duncan-Rainey case and received information from these jailhouse informants incriminating Hall. The first time Arneson and Crocker interviewed Hall, they asked him what he had heard about the Duncan-Rainey murders. Hall responded that he "just heard some stuff" and that he was "just a witness." The officers did not read Hall his *Miranda* rights. The next interview took place four days later and lasted about ten minutes. Two days later, on September 11, 1985, Arneson called Dufort. Arneson said that he planned to interview Hall and insisted that Dufort be there, but would not say why. Dufort tried several times to avoid attending the interview because he was too busy with other work, but ultimately agreed to meet Arneson at the jail. Dufort arrived with his partner, Aaron Martin. They met with Arneson and Crocker, as well as with informant Cornelius Lee. Lee identified Hall as the driver in the 54th Street shooting, suggesting that Hall was not, in fact, an innocent witness as he had testified.

The police then interrogated Hall. First, Dufort and Martin questioned Hall for several hours about the 54th Street shooting. Arneson and Crocker popped into the interview room to ask if they could speak to Hall after Dufort and Martin were finished. The police then moved Hall to a different booth where all four detectives questioned him about the Duncan-Rainey murders. The detectives did not advise Hall of his *Miranda* rights. The detectives used a "we know more information than you think we know" technique in questioning him.

The police asked Hall whether, before the murder, he was smoking dope at a beauty shop with Duncan, whether he had sex with her and whether he had stabbed her. Hall denied stabbing Duncan or having anything to do with her murder, but the police persisted. Arneson falsely claimed that the

police had found Hall's semen in Duncan's mouth and his fingerprints on her body. At this point, Hall became very afraid. He asked for an attorney. Arneson asked Hall why he needed an attorney if he was innocent and said that the only people who need attorneys are guilty and trying to hide something. Arneson then told Hall that the police had found his footprint in the alley near Duncan's body. Hall persisted in his denials.

Arneson then suggested that the police file charges against Hall. Dufort warned Hall that if the police filed murder charges against him and a jury convicted him, he would go to prison with Ace Capone, the Bloods gang member he testified against, and that Capone would kill him. Crocker added that, if Hall ended up in state prison, all the Bloods would be after him for testifying against Capone and that all the Crips, the rival gang, would be after him for driving Capone to the 54th Street shooting. Hall felt tired and hungry, but the detectives kept berating him. The police continued to reject Hall's claims that he had nothing to do with the murders.

Fear took over. Hall worried that if he did not confess, the police would file murder charges. If he was convicted of murder, he would go to prison and be killed. He also worried that if he did not cooperate, the police would remove him from protective housing and put him in the general population, where he would be in danger. Hall broke down and cried, hoping his display of emotion would inspire mercy. It did not.

Hall gave in to desperation, fear and fatigue. The police fed Hall the "facts" about what happened the night of the Duncan-Rainey murder. Hall either acquiesced to each statement or repeated it back to Arneson. Hall both initialed next to mistakes in the statement Crocker had handwritten and signed the statement at the bottom, as the police directed. He did not read the statement. This interrogation lasted somewhere between two and six hours, and the police did not afford Hall any food or bathroom breaks.

After Arneson and Crocker left, Dufort and Martin continued to interrogate Hall about the 54th Street shooting case until the early morning. In all, Hall was questioned between 17 and 19 hours that day. Hall was handcuffed during the interrogations and denied food.

The State charged Hall with the murders of Duncan and Rainey. No physical or forensic evidence connected Hall to the murders. The sole evidence admitted at trial comprised Hall's confession and two documents provided by jailhouse informant Lee—the same Lee who implicated Hall as the driver in the 54th Street shooting. Lee had the cell next to Hall. Lee and Hall had passed sheets of paper back and forth between their cells, with Lee sending over written questions and Hall sending back written responses. Hall's answers, generally innocuous taken by themselves, appeared to incriminate him in the Duncan murder. Expert testimony at trial established that the handwriting on the notes belonged to both Hall and Lee. Many years after trial, Lee admitted that he had erased and re-written the questions after Hall answered them, making it look as though Hall had confessed to killing Duncan, when he had not in fact done so.

Hall was convicted of the Duncan-Rainey murders based on the confession Crocker wrote and the falsified documents Lee gave to the police. Hall spent nineteen years in prison. We granted his habeas petition in 2004, upon determining that Hall's conviction was predicated on the documents Lee falsified, resulting in a denial of due process. *Hall v. Dir. of Corr.*, 343 F.3d 976 (9th Cir. 2003) (per curiam). The State did not retry Hall, and he was released from custody in August 2004. Hall now works full-time for the Los Angeles County Bar Association coordinating the Indigent Criminal Defense Appointments Program.

Following his release, Hall brought this action for damages pursuant to 42 U.S.C. § 1983. The district court, with Judge Schiavelli presiding, granted Appellees' first summary judg-

ment motion. We reversed and remanded on two issues. First, Hall based his claim against the individual detectives on *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc), which held that defendants enjoy a constitutional right to be free from prosecution based on deliberately fabricated evidence. We held that the district court wrongly precluded Hall's claim based on *Devereaux* prong (2) that the individual detectives used such abusive and coercive investigative techniques that they knew or should have known that those techniques would yield false information. In addition, we disagreed with the district court that Hall had abandoned his municipal liability claim. *Hall v. City of Los Angeles*, No. 07-56853, 2009 U.S. App. LEXIS 15428 (9th Cir. July 13, 2009) (unpublished).

On remand, the district court, with Chief Judge Collins presiding, again granted summary judgment for Appellees. The district court held that Hall's coerced interrogation claim was not cognizable under *Devereaux* prong (2) and concluded that even if *Devereaux* applied, Hall had not raised triable issues of fact to support his fabrication-of-evidence claim. The court also granted qualified immunity to the officers. This timely appeal followed.

## II.   Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo both the district court's compliance with our mandate, *Snow-Erlin v. United States*, 470 F.3d 804, 807 (9th Cir. 2006), and its order granting summary judgment, *Bamonte v. City of Mesa*, 598 F.3d 1217, 1220 (9th Cir. 2010). We view the evidence in the light most favorable to Hall, the non-moving party, to determine whether any genuine issues of material fact exist. *Id.*, 598 F.3d at 1220. If not, Appellees are entitled to judgment as a matter of law. *Id.*

## III.  Discussion

### A.  Fabrication-of-Evidence Claim

#### 1.  Law of the Case and the Rule of Mandate

At the outset we must determine whether the law of the case or the rule of mandate precluded the district court from determining the applicability of *Devereaux* prong (2) to Hall's coercive interrogation claim. They did not.

The law of the case doctrine, a judicial invention, aims to promote the efficient operation of the courts. *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir. 1990). It generally preludes a court from reconsidering an issue decided previously by the same court or by a higher court in the identical case. *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000). The issue in question must have been decided explicitly or by necessary implication in the previous disposition. *Id.* Application of the doctrine is discretionary. We therefore review the district court's decision for abuse of discretion. *See Milgard Tempering*, 902 F.2d at 715.

"The rule of mandate is similar to, but broader than, the law of the case doctrine." *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995). A district court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it. *Id.* At the same time, the rule of mandate allows a lower court to decide anything not foreclosed by the mandate. *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993). A district court is limited by our remand when the scope of the remand is clear. *Mendez-Gutierrez v. Gonzales*, 444 F.3d 1168, 1172 (9th Cir. 2006). Violation of the rule of mandate is a jurisdictional error. *United States v. Thrasher*, 483 F.3d 977, 982 (9th Cir. 2007).

Here, the district court did not violate the law of the case. The applicability of *Devereaux* prong (2) to Hall's coercive interrogation claim had never been considered or decided by any court. Our prior decision remanding to the district court stated only that the opinion granting Hall habeas relief did not preclude his § 1983 claim for a *Devereaux* prong (2) violation. The decision did not then go on to analyze whether *Devereaux* prong (2) applied to Hall's coercive interrogation claim. *Hall*, 2009 U.S. App. LEXIS 15428, *4-5.

Nor did the district court violate the rule of mandate, as it was free to decide anything not foreclosed by the mandate. *See Herrington*, 12 F.3d at 904. The mandate stated, "Because the district court's decision regarding collateral estoppel prevented the court and the parties from discovering and considering the evidence relating to *Devereaux* prong (2), we reverse the district court on its determination of prong (2)." *Hall*, 2009 U.S. App. LEXIS 15428, at *5. We did not impose clear limits on the scope of the remand. *See Mendez-Gutierrez*, 444 F.3d at 1172. Moreover, when a court is confronted with issues that the remanding court never considered, the "mandate[ ] require[s] respect for what the higher court decided, not for what it did *not* decide." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (emphasis added) (internal quotation marks and citations omitted). The district court properly considered whether Hall's coercive interrogation claim fell within the purview of *Devereaux* prong (2).

## 2. Cognizability of Coercive Interrogation Claim

Next we turn to the merits of the summary judgment motion granted below. We must consider the district court's conclusion that Hall could not proceed on the theory, pursuant to *Devereaux* prong (2), that his interrogation constituted fabrication of evidence in violation of the Fourteenth Amendment. The district court did not err.

**[1]** "Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights." *Devereaux*, 263 F.3d at 1074. Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotation marks and citations omitted). Thus, the nature of a Section 1983 action requires us to determine whether the right Hall identifies is in fact the one that was allegedly infringed. *See id.* at 394.

**[2]** Hall asserts a Fourteenth Amendment due process claim, predicated on *Devereaux* prong (2), that "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux*, 263 F.3d at 1074-75. We derived this right from the Supreme Court's holding in *Pyle v. Kansas*, 317 U.S. 213, 216 (1942), that "the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution." *Devereaux*, 263 F.3d at 1075. To support a *Devereaux* deliberate-fabrication-of-evidence claim, a plaintiff:

> must, *at a minimum*, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

*Id.* at 1076. The only *Devereaux* issue before us relates to prong (2). *See Hall*, 2009 U.S. App. LEXIS 15428, at *3-5. We must determine whether Hall has put forth specific facts showing that there is a genuine issue of material fact whether Arneson and Crocker used techniques so coercive and abusive

in interrogating Hall that they knew or should have known those techniques would generate false evidence. *Devereaux*, 263 F.3d at 1076.

**[3]** But it is the Fifth Amendment, not the Fourteenth Amendment, that governs Hall's claim. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing such a claim." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations and citations omitted). The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Using a coerced confession against the accused in a criminal proceeding implicates this Fifth Amendment privilege. *E.g., Crowe v. County of San Diego*, 608 F.3d 406, 427-29 (9th Cir. 2010) (discussing *Chavez v. Martinez*, 538 U.S. 760, 765 (2003) (plurality). Here, Hall claims that the detectives coerced his confession and then used that confession to secure his conviction. Thus, the Fifth Amendment is the explicit constitutional provision that governs Hall's claim.

**[4]** Hall has not brought a Fifth Amendment claim regarding his confession, however. While Hall did seek to amend his complaint to add an explicit Fifth Amendment claim, Judge Schiavelli denied that motion. This is where *Devereaux* prong (2) comes into play. Most likely because Hall's complaint does not include a Fifth Amendment claim, Hall alleges that Appellees violated his Fourteenth Amendment substantive due process right not to suffer a conviction based on deliberately fabricated evidence. He attempts mightily to make his coerced confession claim fit within a fabrication-of-evidence framework. However artful this argument may be, it comes to nothing. As the district court held, Hall "cannot remedy his inadequate pleading now by repackaging a Fifth Amendment coerced interrogation claim as one for deliberate fabrication of evidence arising under the Fourteenth Amendment."

A survey of our caselaw confirms that Hall misses the mark when he construes his coerced-confession claim as properly cognizable under *Devereaux* prong (2). The facts in *Devereaux* concerned the investigation of alleged sex abuse involving lengthy and improper interviews of purported child victims. 263 F.3d at 1073. These children did not endure coerced interrogation techniques as suspects, but as third parties. Moreover, in finding a right to be free from deliberately fabricated evidence in *Devereaux*, we relied in part on *Pyle*. That case involved perjured testimony, also furnished by third parties. 317 U.S. at 214. In fact, all of our published cases that follow *Devereaux* concern interview techniques used to elicit evidence from third-party witnesses, not the coerced interrogation of a suspect. *See, e.g.*, *Stoot v. City of Everett*, 582 F.3d 910, 919 n.9 (9th Cir. 2009) (discussing claim that detective coerced child victim); *Gausvik v. Perez*, 345 F.3d 813, 816-17 (9th Cir. 2003) (discussing claim that police officer used "overbearing tactics" in interviewing victims of alleged sex abuse)*; Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (discussing claim that officers used coercive tactics when interviewing suspect's daughters). The one case that did not involve third party witnesses also did not involve the coercive interrogation of a suspect. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111-14 (finding due process right to be free from deliberately fabricated evidence in a child abuse proceeding where plaintiff produced evidence that a social worker deliberately falsified statements).

**[5]** There is no question that the interrogation tactics Hall alleges trouble us, but we are bound by the law as it stands. Hall's coerced confession claim falls within the explicit language of the Fifth Amendment and does not arise as a subset of the substantive due process right set forth in *Devereaux* prong (2). We have little choice but to affirm the grant of summary judgment to Appellees. Because we affirm the conclusion below that *Devereaux* prong (2) does not apply to Hall's coerced confession claim, we have no occasion to consider the district court's holding that Hall did not create triable

issues of fact in support of his deliberate fabrication-of-evidence claim.

### 3.   Qualified Immunity

The district court did not err in granting qualified immunity to Arneson and Crocker. They are entitled to qualified immunity unless (1) Hall has alleged facts that make out a violation of a constitutional right and (2) that constitutional right was clearly established at the time of the officers' alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

**[6]** As discussed, Hall's right to be free from criminal charges based on evidence deliberately fabricated by the government does not encompass Hall's coerced confession claim. Hall, therefore, has not alleged facts that would establish the violation of his constitutional rights. The detectives therefore enjoy qualified immunity as to this claim, and we need not address whether the right Hall asserts was clearly established at the time of his interrogation. *See id.* at 232-36.

### 4.   Municipal Liability

Because Hall has not presented evidence creating a triable issue of fact that Appellees violated his constitutional rights, we need not reach the issue of municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). *See Aguilera v. Baca*, 510 F.3d 1161, 1174 (9th Cir. 2007).

### B.   Fifth Amendment Coerced Confession Claim

**[7]** At oral argument, we asked the parties whether we have the authority to remand this matter to the district court with instructions to allow Hall to amend his complaint to allege an explicit Fifth Amendment coerced confession claim. We also asked the parties whether, if we do in fact have the

authority to remand this case to the district court, we should exercise our discretion to do so. To give the parties a full and fair opportunity to address these questions, we also ordered supplemental briefing.

### 1.   Jurisdiction

Before considering the propriety of remanding this matter, we must ensure that we have appellate jurisdiction to consider sua sponte whether the district court erred in denying Hall's request to amend the complaint to incorporate an explicit Fifth Amendment claim. *See Rowe v. United States*, 633 F.2d 799, 800 (9th Cir. 1980). We do.

"The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ." 28 U.S.C. § 1291. An order denying leave to amend a complaint is not appealable. *Bradshaw v. Zoological Soc'y. of San Diego*, 662 F.2d 1301, 1304 (9th Cir. 1981). "Such orders, as a class, contemplate further proceedings in the district court, and [we] ha[ve] previously held that review is available after the final judgment, into which they merge." *Id.* Once a district court enters final judgment and a party appeals, however, those earlier, non-final orders become reviewable. *Licthfield v. Spielberg*, 736 F.2d 1352, 1355 (9th Cir. 1984) ("An appeal from a final judgment draws in question all earlier, non-final orders and rulings which produced the judgment."). This is so because the earlier non-final orders merge with the judgment. *Bradshaw*, 662 F.2d at 1304.

**[8]** This case comes to us on a timely notice of appeal of the district court's summary judgment, a final order. By appealing the final judgment, Hall implicitly brought all of the district court's subordinate orders within the jurisdiction of our court. *Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir. 1994) ("When reviewing final judgments in civil proceedings we have jurisdiction to review any interlocutory orders or other rulings that may have affected the outcome below."),

*superseded on other grounds by* 28 U.S.C. § 2253(c); *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff*, 768 F.2d 1099, 1103 (9th Cir. 1985) ("While we recognize the importance of correcting erroneous interlocutory rulings as early as possible, the failure to challenge an erroneous interlocutory ruling does not make the error appeal proof when the final judgment comes before this court for review"), *superseded on other grounds by* 28 U.S.C. § 2253(c); *cf. Sackett v. Beaman*, 399 F.2d 884, 889 n.6 (9th Cir. 1968) ("[T]he question of whether there was an abuse of discretion in denying leave to amend can be reviewed under the final judgment notwithstanding the fact that such judgment makes no reference to such denial. All interlocutory rulings merged in the final judgement and are reviewable on appeal therefrom."); *see also Atchison, T. & S.F. Ry. Co. v. Jackson*, 235 F.2d 390, 392 (10th Cir. 1956) ("[F]or purposes of appeal, an interlocutory action from which no direct appeal will lie becomes merged into the final judgment and is open to review on appeal from the final judgment").

**[9]** Hall has satisfied the statutory requirements of jurisdiction. Fed. R. App. P. 3(c)(1)(B); *see also Smith v. Barry*, 502 U.S. 244, 247-48 ("Courts will liberally construe the requirements of Rule 3."); *Ortberg v. Moody*, 961 F.2d 135, 137 (9th Cir. 1992) ("The purpose of Rule 3 is to ensure that the other party is informed of the intent to appeal."); *Munoz v. Small Bus. Admin.*, 644 F.2d 1361, 1364 (9th Cir. 1981) (holding that "an appeal from the final judgment draws in question all earlier non-final orders and all rulings which produced the judgment" and also that a second judgment calls into question the propriety of the first, giving the court jurisdiction over both). We therefore have jurisdiction to review the district court's earlier denial of Hall's motion to amend in connection with our review of the final judgment now before us.

## 2. Manifest Injustice

**[10]** Having satisfied ourselves that we have jurisdiction, we next ask whether we can and should remand for amend-

ment of the complaint. Ordinarily, we refrain from consider-ing an issue that a party has failed to raise. *Laboda v. Calderon*, 224 F.3d 972, 985 (9th Cir. 2000). We note, how-ever, two exceptions to this general practice, both of which have force here: We may consider an issue sua sponte if fail-ure to do so would result in manifest injustice, or if the oppos-ing party will not suffer prejudice. *Id.*; *see also Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1182 (9th Cir. 2001); *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992).

[11] The extraordinary circumstances here convince us that we must remand this matter for amendment of the complaint in order to prevent a woefully unjust result. A jury convicted Hall of murder, a crime he did not commit, based only on his confession and falsified documents manufactured by a jail-house informant. Hall served nineteen years in prison. Detec-tives interrogated an eighteen-year-old Hall for up to six hours, with no *Miranda* advisement. He was handcuffed and denied food. When Hall asked for an attorney, Arneson asked why Hall needed an attorney if he did not commit the crime. Arneson also told Hall that only guilty people who were try-ing to hide something needed attorneys. Dufort, the detective Hall had grown to see as a trusted friend and father figure, cautioned Hall that murder charges would lead to a convic-tion, which would land Hall in prison with Ace Capone and that Capone would kill him. Crocker then added that Hall would find himself in serious danger if he ended up in state prison because the Bloods would want revenge for his testi-mony in the 54th Street case, and the Crips would want revenge for Hall driving Capone during the 54th Street shoot-ing. Hall—weary, hungry and terrified for his life and safety —finally confessed to the crime with "facts" that Arneson spoon-fed him. Hall initialed and signed the statement, but he never read it. The police interrogated Hall, handcuffed, for somewhere between 17 and 19 hours that day.

[12] Certainly, on these facts, Hall's § 1983 counsel should have pled a Fifth Amendment coerced confession claim in the

initial complaint. That error turned out to be unfortunate and, without remand for amendment of the complaint, would prove dire to Hall's case. But we cannot escape the fact that justice eluded Hall during his highly suspect, and constitutionally questionable, interrogation. Justice eluded Hall when he suffered a conviction based on that confession and the patently false inculpatory evidence created by a jailhouse informant. Justice eluded Hall when he served nineteen years in state prison for a crime he did not commit. And justice will elude Hall yet again without the opportunity to amend his complaint and let a jury decide whether he deserves monetary compensation for his unlawful incarceration. If ever there were an exceptional case where we should exercise our discretionary power to avoid manifest injustice, we believe this must be it. *See United States v. Atkinson*, 297 U.S. 157, 160 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings."); *cf. United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (finding manifest injustice despite defendant raising claim only in reply brief).

### 3. Prejudice to Appellees

[13] We find Appellees' contention that they had no fair notice of Hall's Fifth Amendment claim curious, if not disingenuous. While Hall did not identify an explicit Fifth Amendment claim, his 2005 complaint alleged facts that form the basis of a classic coerced confession claim. Hall claimed that the detectives (1) did not give him a *Miranda* admonition any of the times they interviewed or interrogated him, (2) told Hall he would be murdered in prison if he did not confess and (3) subjected him to combined interrogations totaling 17 to 19 hours. Moreover, we provided the parties the opportunity to brief this issue. *Alcaraz v. INS*, 384 F.3d 1150, 1161 (9th Cir. 2001) (citing *United States v. Gamma Tech Indus., Inc.*, 265

F.3d 917, 930 (9th Cir. 2001)). On the record before us, we cannot conclude that amendment of the complaint would cause Appellees undue prejudice.

#### 4.  Denial of Request to Amend

We now consider whether the district court erred in denying Hall's motion to amend. We review the denial of a motion to amend for abuse of discretion. *Jackson v. Bank of Haw.,* 902 F.2d 1385, 1387 (9th Cir. 1990).

Two years after filing his complaint, Hall sought leave to amend his complaint to add an explicit Fifth Amendment claim. The district court denied this request upon a finding that Hall failed to meet and confer and that amendment would prejudice Appellees because of undue delay. District Court Docket Nos. 85 (citing *United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1527 (9th Cir. 1995) (affirming denial of motion to amend where plaintiff waited three years to amend, amendment would have required additional discovery and plaintiff had amended the complaint once before)). The district court abused its discretion in prohibiting amendment of the complaint.

**[14]** Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading once as a matter of course within certain time limits, or, in all other instances, with the court's leave. Fed. R. Civ. P. 15(a). Because the relevant time period had elapsed for an amendment as a matter of course, Hall sought the court's permission to amend. When a party requests to amend a pleading, "[t]he court should freely give leave when justice so requires." *Id.*; *see also Wyshak v. City Nat'l Bank*, 607 F.2d 824, 826-27 (9th Cir. 1979) (per curiam) (finding no abuse of discretion where district court allowed amendment of answer to assert statute of limitations because the defense existed at the time plaintiff sued). "[T]his mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances relied upon by a

plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Id.* Moreover, "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' " *Id.*

**[15]** Here, the district court's reliance on Hall's failure to meet and confer falls outside the supportable bases for denying a motion to amend. The district court also found that amendment would prejudice Appellees because Hall waited two years from the filing of his initial complaint to add his Fifth Amendment claim. As we have noted, however, the complaint gave Appellees fair notice of the facts supporting the coerced interrogation claim. Moreover, it is questionable whether amendment would have required additional discovery, given the extensive discovery the parties had conducted already.

An ordinary case in which counsel neglected to allege an obvious claim in a pleading would not warrant sua sponte consideration of an issue, nor would we feel compelled to find an abuse of discretion. But we are not called to consider an ordinary case, but, rather, an extraordinary one involving an unfortunate confluence of events—events not fit for a just and fair society. We are reminded today that as jurists we hold the power to protect individuals against arbitrary government action and abuse of power. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 331 (1986). In remanding this matter to the district court, we intend to safeguard the fairness, integrity and reputation of our courts, by making justice possible for Hall. *See Atkinson*, 297 U.S. at 160.

## IV. Conclusion

**[16]** We affirm the grant of summary judgment to Appellees on Hall's fabrication of evidence claim. We reverse the

denial of Hall's motion for leave to amend his complaint and remand to the district court to allow Hall to allege an explicit coercive interrogation claim pursuant to the Fifth Amendment.

**AFFIRMED in part, REVERSED in part, REMANDED.** Each side shall bear its own costs.

---

IKUTA, Circuit Judge, dissenting:

Not content with our task, prescribed by Article III, of deciding the controversies raised by the parties, the majority has decided to ask and answer its own legal questions instead. At oral argument, the majority sua sponte raised the possibility that instead of addressing Harold Hall's sole argument on appeal that the district court had erred in rejecting his Fourteenth Amendment claim, we could revive and address an unrelated and unappealed procedural issue: whether, over five years earlier, the district court had erred in denying Hall's motion to amend his complaint to add a new Fifth Amendment claim.

Today, the majority takes itself up on that offer. It begins by creating a novel legal argument for Hall and then, having concluded that its own argument has merit, it proceeds to resolve the case on those grounds. Maj. Op. at III.B. In doing so, the majority disregards the most basic principles of judicial restraint, erroneously overturns a district court decision that we have no jurisdiction to review, and gives Hall relief that he never asked us to give. While the majority claims that these imprudent steps are necessary to "safeguard the fairness, integrity and reputation of our courts," maj. op. at 11759, I fear that they will have the exact opposite effect. I dissent.

I

Because the majority's impassioned retelling of Hall's story is economical with the procedural facts relevant to this appeal, I will begin by outlining them here.

A

In 2003, a split panel of this court granted Hall's habeas petition on the grounds that "false and material evidence was admitted at Hall's trial in violation of his due process rights," and the state court's contrary ruling was an unreasonable determination of the facts. *Hall v. Dir. of Corrections*, 343 F.3d 976, 985 (9th Cir. 2003) (*Hall I*). *Hall I* rejected Hall's other constitutional claims, including his Fifth Amendment claims for violation of his *Miranda* rights and right against self-incrimination, stating "[w]e have examined the record and find that these claims are without merit." *Id.* at 981 n.5.

In March 2005, Hall brought suit for money damages under 42 U.S.C. § 1983 against the City of Los Angeles, the Los Angeles Police Department, and various police officers involved in his prosecution. He alleged claims for relief based on his unlawful arrest in violation of the Fourth Amendment and the use of false evidence against him at trial in violation of his Fourteenth Amendment due process rights.

Some two years later, in May 2007, after the close of discovery and less than five months before the scheduled trial, Hall moved to amend his complaint. The proposed amended complaint dropped Hall's Fourth Amendment claim, which had become time-barred in light of a recent Supreme Court case, and added an entirely new claim for violation of his Fifth Amendment right against self-incrimination.[1]

---

[1]Hall's motion to amend asserts that "plaintiff is adding no new claim" to the amended complaint, but this assertion is belied by the amended complaint itself (attached to the motion), which provides a redlined comparison with the original complaint. For example, paragraph 37 of the amended complaint begins:

> Plaintiff has a right to be free from ~~unreasonable seizures~~ being a witness against himself, as protected by the ~~Fourth~~ Fifth Amendment. . . ."

The City objected to the proposed amendment. First, the City asserted that, contrary to his declaration, Hall had failed to follow local rules requiring the parties to meet and confer prior to the filing of any motion to amend. *See* C.D. Cal. Local Rule 7-3. Second, according to the City, Hall had unduly delayed his attempt to amend the complaint: he knew all the facts underlying his Fifth Amendment claim when he originally filed suit in March 2005, yet he unreasonably waited over two years to add that new claim. Further, the City contended, this amendment would be prejudicial because it would require the City to prepare for an entirely new constitutional claim with only months to go before trial and without the benefit of additional discovery. The district court agreed, holding that Hall had failed to comply with the requirement to meet and confer, and also that his undue delay in amending his complaint would be prejudicial to the City. Accordingly, on June 19, 2007, it denied Hall's motion for leave to amend his complaint.

The City then filed a motion for summary judgment on Hall's one remaining claim: that the City's police officers violated his Fourteenth Amendment due process rights by using interrogation techniques so coercive that they knew the interrogation would generate false evidence. The district court granted summary judgment to the City on this claim, partly because it concluded that *Hall I*'s determination that Hall's self-incrimination claim was "without merit," *Hall I*, 343 F.3d at 981 n.5, had a preclusive effect on Hall's Fourteenth Amendment false evidence claim, which also focused on the police officers' allegedly coercive interrogation tactics.

In December 2007, Hall filed a notice of appeal stating his intent to appeal the district court's order granting the City's summary judgment motion. Neither the notice of appeal nor Hall's appellate briefing made any mention of the district court's June 2007 denial of his motion to amend his complaint. Instead, Hall challenged the district court's determination that *Hall I* precluded his Fourteenth Amendment claim,

and reiterated his argument that his Fourteenth Amendment right to be free from prosecution based on false evidence had been violated. In July 2009, a different panel of this court reversed the district court's conclusion that *Hall I* had a preclusive effect, and remanded for further consideration of Hall's Fourteenth Amendment false evidence claim. *Hall v. City of Los Angeles*, 2009 WL 2020851 (9th Cir. 2009) (*Hall II*).

On remand, the district court again granted summary judgment to the City. First, the court held that Hall's claim was not cognizable under the Fourteenth Amendment, but should have been raised as a violation of his Fifth Amendment right against self-incrimination. Second, the district court ruled that even if Hall's claim was cognizable under the Fourteenth Amendment, there was no genuine issue of material fact that the City's police officers had generated false evidence. Hall filed a notice of appeal challenging the district court's order granting the City summary judgment.

B

This second appeal is now before us. As in his first appeal, Hall advances no argument that the district court erred in June 2007 when it denied his motion to add a Fifth Amendment claim to his complaint. In fact, the gist of Hall's argument is that the district court erred in holding that his claim was cognizable only under the Fifth Amendment for the simple reason that he was *not* bringing a Fifth Amendment claim. Rather, he was bringing a broader Fourteenth Amendment claim that the officers "fabricated the evidence (including but not limited to the false confession)" that was used to prosecute him. The City's briefing responds to Hall's Fourteenth Amendment arguments.

Thus, on appeal, we should address the question Hall actually raised: whether his Fourteenth Amendment false evidence claim survives summary judgment. Hall relies on our

en banc decision in *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) (en banc), to argue that his due process rights were violated because the City's police officers used "investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076. But, as the majority explains, we have never applied *Devereaux*'s prohibition against the fabrication of evidence to adjudicate claims involving the coercive interrogation of a suspect. Maj. Op. at 11752. Whereas *Devereaux* relies on the "scarce and open-ended" guideposts of substantive due process, *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992), the "explicit textual source" of the Fifth Amendment protects a suspect from coercive interrogation, *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Accordingly, Hall's claim that the City used his coerced confession to convict him is cognizable under the Fifth Amendment, not the Fourteenth Amendment. *See Albright*, 510 U.S. at 273. Because Hall has not brought a Fifth Amendment claim, we must affirm the district court's grant of summary judgment to the City on Hall's Fourteenth Amendment claim.[2] The majority agrees with this Fourteenth Amendment analysis and thus, it correctly affirms the district court's grant of summary judgment to the City on Hall's Fourteenth Amendment claims. That ruling should end this case. It is all that the parties asked us to decide.

II

But that is not all the majority wants to decide. After rejecting Hall's argument as a failed "repackaging [of] a Fifth Amendment coerced interrogation claim as one for deliberate fabrication of evidence arising under the Fourteenth Amendment," maj. op. at 11751, the majority then proceeds sua sponte to offer Hall a different, unasked for, package of relief: a second chance to add a Fifth Amendment claim to his com-

---

[2]For similar reasons, we must also affirm the district court's grant of qualified immunity to the City's police officers.

plaint, five years, two summary judgments, and two notices of appeal after the fact. To do so, the majority posits an appeal (one not actually brought by Hall) from the district court's June 2007 order denying Hall's motion to amend his complaint; asserts appellate jurisdiction over this theoretical appeal; posits an argument (one not actually raised by Hall) for why the district court abused its discretion by denying Hall's motion to amend his complaint; and relies on that argument to conclude that the district court did abuse its discretion. This enterprise has no basis in precedent and disregards many of our long-standing jurisdictional and procedural limitations.

## A

The majority begins by skipping over the most important limitation on a federal court: our jurisdiction. Here, we are simply without authority to review this "appeal" of the district court's long-forgotten denial of Hall's motion to amend. It is a basic requirement of appellate jurisdiction that "[t]he notice of appeal must . . . designate the judgment, order or part thereof being appealed from." Fed. R. App. Proc. 3(c);[3] *see Smith v. Barry*, 502 U.S. 244, 248 (1992) ("[N]oncompliance [with Rule 3] is fatal to an appeal."); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 317 n.3 (1988) (refusing to waive a noncompliant notice of appeal because "a litigant's failure to clear a jurisdictional hurdle can never be 'harmless' or waived by a court."). Hall's notice of appeal identifies only

---

[3]Rule 3(c)(1) provides that

The notice of appeal must:

(A) specify the party or parties taking the appeal by naming each one in the caption or body of the notice . . .

(B) designate the judgment, order, or part thereof being appealed; and

(C) name the court to which the appeal is taken.

Fed. R. App. P. 3(c)(1).

the second summary judgment; he does not designate the district court's June 2007 denial of leave to amend his complaint as a subject of appeal, nor does he provide any indication of an intent to challenge that order in his briefing or argument to this court. *Cf. Shapiro ex rel. Shapiro v. Paradise Valley Unified School Dist. No. 69*, 374 F.3d 857, 863-64 (9th Cir. 2004) (holding that an insufficient notice of appeal was remedied by sufficient appellate briefing).

The majority claims it has jurisdiction because "earlier, non-final orders become reviewable" once a district court enters a final judgment. Maj. Op. at 11754. While the majority is correct in explaining when an interlocutory order satisfies the finality requirements of 28 U.S.C. § 1291, the majority ignores the separate jurisdictional bar provided by Rule 3. Even if an interlocutory order becomes sufficiently final by merging with a later final judgment, the appellant must still identify the prior order in the notice of appeal or discuss it in its appellate briefing in order to demonstrate *some* intent to appeal it. *See Lynn v. Sheet Metal Workers' Int'l Ass'n*, 804 F.2d 1472, 1481 (9th Cir. 1986). That was not done here.[4] Accordingly, we lack jurisdiction to consider the district court's June 2007 order denying Hall leave to amend his complaint to add a Fifth Amendment claim. *See, e.g.*, *Johnson v. Smithsonian, Inst.*, 189 F.3d 180, 185 n.2 (2d Cir.

---

[4]The majority does not just liberally construe Rule 3's requirements, it ignores them entirely: the notice of appeal here raises no inference of an intent to appeal the district court's June 2007 order. *Cf. Munoz v. Small Bus. Admin.*, 644 F.2d 1361, 1364 (9th Cir. 1981) (holding that "the rule is well settled that a mistake in designating the judgment appealed from should not result in loss of the appeal *as long as the intent to appeal from a specific judgment can be fairly inferred from the notice* and the appellee is not misled by the mistake.") (emphasis added). But liberally applying a jurisdictional requirement is not the same as eliminating it, which the majority has effectively done here. *See Smith*, 502 U.S. at 248 ("This principle of liberal construction does not, however, excuse noncompliance with [Rule 3]."); *Torres*, 487 U.S. at 315-16 ("Permitting imperfect but substantial compliance with a technical requirement is not the same as waiving the requirement altogether as a jurisdictional threshold.").

1999) (dismissing an appeal of an order denying leave to amend a complaint for lack of compliance with Rule 3(c)); *Capital Parks, Inc. v. Southeastern Ad. and Sales Sys., Inc.*, 30 F.3d 627, 630 (5th Cir. 1994) (same).

B

Even if we could set aside this jurisdictional issue, the majority should not have abandoned the long-standing procedural rules we have developed to maintain judicial restraint. First, it is hornbook law that "[w]e need not and do not consider a new contention that could have been but was not raised on the prior appeal." *Munoz v. Imperial Cnty.*, 667 F.2d 811, 817 (9th Cir. 1982); *see also Jimenez v. Franklin*, 680 F.3d 1096, 1099-1100 (9th Cir. 2012). As described above, Hall could have challenged the district court's June 2007 order denying him leave to amend when he appealed that court's first summary judgment order to a prior panel of this court. Because he "failed to do so," he "cannot relitigate the issue here." *Jimenez*, 680 F.3d at 1100.

Second, it is also well established that "[w]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief." *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (internal quotation marks omitted). The majority concedes that such waiver occurred here, but it nevertheless considers Hall's forfeited argument because the failure to consider it here would result in a manifest injustice and Hall's failure to raise the issue properly did not prejudice the City's defense. *See id.*; Maj. Op. at 11755-57.

Both conclusions are incorrect. As a general matter, we have reached unbriefed issues to avoid "manifest injustice" only in criminal or deportation cases, where the deprivation of rights resulting from a waiver are most severe. All the cases cited by the majority to support its "manifest injustice" reasoning are consistent with this pattern. Maj. Op. at

11756-57. *See, e.g.*, *United States v. Atkinson*, 297 U.S. 157, 160 (1936) (noting that such "exceptional circumstances" arise "especially in criminal cases"); *Ullah*, 976 F.2d at 514 ("[I]t is 'manifestly unjust' to reverse the conviction of one co-defendant but to uphold the conviction of another co-defendant when the same error affected both defendants."). The majority fails to point to a single case holding there was "manifest injustice" where the only thing at stake was the loss of civil damages, as is the case here.

The majority also errs in concluding that our consideration of Hall's waived argument regarding amending his complaint would not prejudice the City because it had fair notice of Hall's Fifth Amendment claim. Maj. Op. at 11757-58. While this was certainly true when Hall attempted to amend his complaint in 2007, the district court denied such an amendment and Hall chose not to appeal that denial. At that point, it was reasonable for the City to conclude that the Fifth Amendment claim was gone. Now, five years and two appeals later, the majority both resurrects and resolves the question whether the district court abused its discretion in denying Hall's motion to amend his complaint. As a result, the City is on the losing end of an argument it never had a chance to refute.

C

Even if we overlooked our jurisdictional limits, turned back the clock, and pretended that Hall had actually appealed the district court's denial of leave to amend, the majority is still wrong in reversing the district court. We have repeatedly held that a district court does not abuse its discretion in denying a motion to amend a complaint "where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to fully develop his contentions originally." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995); *Allen v. City of Beverly Hills*, 911 F.2d 367, 374 (9th Cir. 1990); *Vincent v. Trend W. Technical Corp.*, 828 F.2d

563, 570-71 (9th Cir. 1987); *Stein v. United Artists Corp.*, 691 F.2d 885, 898 (9th Cir. 1982). That principle squarely governs this case. Despite his disingenuous statement that he was "adding no new claim" to the proposed amended complaint, Hall's excerpts from the redline he attached to his motion to amend show otherwise:

> The individual defendants, while acting under color of law, deprived plaintiff of his civil rights by violating his right under the ~~Fourth Amendment to be free from unreasonable seizures and his right~~ under the <u>Fifth and</u> Fourteenth Amendment to due process of law in that they ~~seized plaintiff~~ or caused plaintiff to be ~~seized and~~ imprisoned, for approximately 19 years, ~~without a warrant or probable cause to believe that he was involved in criminal activity,~~ <u>by</u> knowingly using false and fabricated evidence ~~upon which~~, <u>including confessions extracted in violation of the Fifth and Fourteenth Amendments,</u> to convict plaintiff. . . .

> "Plaintiff has a right to be free from ~~unreasonable seizures~~ <u>being a witness against himself,</u> as protected by the ~~Fourth~~ <u>Fifth Amendment</u> . . . ."

These proposed changes demonstrate that the amended complaint merely substitutes a "new theory" (under the Fifth Amendment) for an old one (under the Fourth Amendment). Given that, in the majority's view, Hall's original complaint gave rise to a "classic [Fifth Amendment] coerced confession claim," maj. op. at 11757, Hall has provided no explanation, much less a "satisfactory" one, for why it took him nearly two years to make this change. *See Allen*, 911 F.2d at 374. The district court's determinations that Hall had failed to comply with local rules, that there had been undue delay in amending the complaint, and that such a delay prejudiced the City's defense are not "illogical, implausible, or without support in inferences that may be drawn from the record." *United States*

*v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). Accordingly, the district court did not abuse its discretion by denying Hall leave to amend.

## III

As should be obvious by now, this case is not about applying the law to answer the questions raised, briefed, and argued by the parties. Rather, for the majority, this case is about a "confluence of events [ ] not fit for a just and fair society." Maj. Op. at 11759. It is about "protect[ing] individuals against arbitrary government action and abuse of power." Maj. Op. at 11759. And above all, it is about "prevent[ing] a woefully unjust result." Maj. Op. at 11756. Thus, as the majority tells us, this is not "an ordinary case" involving a district court's grant of summary judgment in a civil action, "but, rather, an extraordinary one." Maj. Op. at 11759.

These equitable concerns carry the majority beyond what the Constitution empowers us to do. Article III gives us the authority to decide cases and controversies, provided to us through the "proper adversarial clash" between litigants. *Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Compensation Prog., Dep't of Labor*, 519 U.S. 248, 266 (1997). A fundamental premise of this adversarial system is "that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *NASA v. Nelson*, 131 S. Ct. 746, 756 n.10 (2011) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)).

These limitations are imposed on the judiciary to "ensure that its desire to do good will not tempt it into abandoning its limited role in our constitutional Government." *Missouri v. Jenkins*, 515 U.S. 70, 136 (1995) (Thomas, J., concurring). By reaching beyond our jurisdiction and beyond the questions "presented and argued by the parties before" us, *Nelson*, 131 S. Ct. at 756 n.10, the majority unwisely turns its back on

these fundamental principles of judicial restraint and in doing so, undermines the very principles of fairness and integrity it purports to advance.

I dissent.